IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
August 29, 2023 Session

## STATE OF TENNESSEE v. TIMOTHY ELLIOTT DAVIS

**Appeal from the Criminal Court for Monroe County**
No. 19-347 Sandra Donaghy, Judge
_____

**No. E2022-01539-CCA-R3-CD**
_____

Defendant, Timothy Elliott[1] Davis, was convicted by a jury of driving under the influence of an intoxicant ("DUI") and driving under the influence of an intoxicant with a blood alcohol concentration ("BAC") greater than 0.8 ("DUI per se"). Defendant pled guilty to DUI, third offense following the jury verdict on the first two counts. The trial court sentenced Defendant to eleven months, twenty-nine days, suspended to supervised probation upon service of seven months in the county jail. On appeal, Defendant argues that the trial court erred in denying his motion to suppress the results of a blood alcohol test and that the evidence is insufficient to support the guilty verdict. Following our review of the record, the briefs, and oral arguments of the parties, we affirm the judgments of the trial court but remand for correction of the judgment forms consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, P.J., and JAMES CURWOOD WITT, JR., J., joined.

Brian E. Nichols, Loudon, Tennessee, for the appellant, Timothy Elliott Davis.

Jonathan Skrmetti, Attorney General and Reporter; Abigail H. Rinard, Assistant Attorney General; Shari Tayloe, District Attorney General; and Clay Collins and Wayne M. Bridgham, Assistant District Attorneys General, for the appellee, State of Tennessee.

---

[1] Although Defendant's middle name is spelled "Elliot" throughout the record, we will rely on the spelling used in the indictment and the transcript of his trial testimony.

# OPINION

## Facts and Procedural Background

This case arose when Defendant was observed driving recklessly in the Vonore Park Industrial area. A sheriff's deputy responded to the call and found Defendant in his vehicle pulled over but partially in the lane of traffic. During the stop, Defendant was arrested for DUI. Because Defendant refused to consent to a blood test, the deputy began drafting an application for a warrant to conduct a blood draw. The warrant could not be executed because a general sessions judge could not be reached. Defendant's blood was drawn without a warrant. His BAC tested well above the legal limit. He was indicted by the Monroe County Grand Jury of DUI (Count 1), DUI per se, (Count 2), and DUI, third offense (Count 3). Count 2 contained two alternate charges: driving while the BAC was .08% or more, and driving while the BAC was .20% or more.

On July 13, 2021, Defendant filed a motion to suppress his BAC test on the grounds that the State's reliance on the exigent circumstances exception to the warrant requirement could not be justified under *Missouri v. McNeely,* 569 U.S. 141 (2013) and *State v. Oaks,* No. E2017-02239-CCA-R3-CD, 2019 WL 560271 (Tenn. Crim. App. Feb. 12, 2019).

### *Suppression Hearing*

Brian Millsaps, a sheriff's deputy in the Monroe County Sheriff's Office testified that on March 1, 2019, at 4:26 a.m., he was assigned to be on the lookout for "a reckless driver" in a "red vehicle traveling on 411 north" in Monroe County. A few minutes later, Officer Millsaps saw a vehicle matching the vehicle's description and nearly identical license tag information on Excellence Way, in Vonore Industrial Park, an area populated by several industrial companies.

When Officer Millsaps observed the vehicle it was going in reverse partially on the shoulder and partially in the lane of traffic on a "fairly busy road" at a time when traffic was "real heavy" due to a shift change at Carlex. Officer Millsaps pulled in behind the vehicle and turned on his patrol lights. Defendant told Officer Millsaps that he was on his way to work at Carlex and had pulled over because he had missed his turn. Officer Millsaps asked Defendant for his license, registration, and insurance, but Defendant could not provide any of the requested documents; he stated that he had the paperwork to reinstate his license but could not get enough days off from work to do so. Officer Millsaps observed that Defendant smelled of alcohol.

Officer Millsaps asked Defendant to step out of the vehicle. Defendant was unsteady on his feet, had difficulty focusing, and used profanity as he spoke. Officer

- 2 -

Millsaps recalled Defendant's becoming "hostile" and "aggravated" with each simple request. Defendant insisted that he had not consumed alcohol since 9:00 p.m. the prior evening. Officer Millsaps asked Defendant to perform two field sobriety tests: the horizontal gaze nystagmus ("HGN") test and the walk and turn test. Because Defendant could not complete or pass either test, Officer Millsaps placed Defendant under arrest for DUI. The arrest occurred around 4:48 a.m., approximately eighteen minutes after Officer Millsaps pulled in behind Defendant's vehicle.

Officer Millsaps could not transport Defendant to the jail immediately because he was responsible for securing Defendant's vehicle. He called for a tow truck to tow Defendant's vehicle and took a written inventory while waiting for the tow truck to arrive. However, an officer in the Vonore Police Department had arrived at the scene during the traffic stop and offered to wait on the tow truck so that Officer Millsaps could transport Defendant to the sheriff's office. The encounter between Defendant and Officer Millsaps was recorded on Officer Millsaps' body camera ("bodycam"). According to the timestamp on the video, Officer Millsaps left the scene with Defendant at 5:14 a.m., about forty-five minutes after the stop had begun. Officer Millsaps estimated that it took about twenty minutes to transport Defendant to the "old jail" in downtown Madisonville. There, Officer Millsaps completed paperwork connected to the arrest such as the warrant, arrest report, and the tow truck slip. Defendant was booked into the jail at 5:35 a.m.

Because the intoximeter was not working and Defendant refused consent to a blood draw, Officer Millsaps began drafting an application to obtain a warrant to draw Defendant's blood. He prepared an affidavit, a statement of facts, and information about Defendant for the warrant application. The warrant application was introduced as an exhibit. Officer Millsaps called the general sessions judge in Monroe County "at least five times" but the judge did not answer. He explained that in seeking warrants, when the general sessions judge is unavailable, protocol is for him to call one of the two criminal court judges in the district. He was not certain, but believed that both criminal court judges lived in Bradley County. He explained that considering distance and morning traffic, it would take "roughly one hour each way" to the criminal court judge in Bradley County, and that did not include the time the criminal court judge would need to review the warrant application. Officer Millsaps acknowledged that he was not an expert on serology or DNA but understood, based on experience, that people "sober up over time." Thus, he understood that had he waited another two to three hours to draw Defendant's blood, the evidence "would be gone."

Knowing how long it would take to reach a criminal court judge and concerned about the diminution of blood evidence, Officer Millsaps called the on-call district attorney who advised him to proceed with the blood draw based on exigent circumstances.

Defendant's blood was drawn at 7:20 a.m., about three hours after Officer Millsaps first made contact with Defendant.

On cross-examination, Officer Millsaps testified that he knew where the general sessions judge lived in Sweetwater, but he did not contact another officer to determine whether they were patrolling near the general sessions judge's residence. He agreed that it was a fifteen to twenty minute drive to the general sessions judge's residence from the old county jail. He did not reach out to any Bradley County officers to determine whether either criminal court judge could be located nor did he personally contact either criminal court judge. He confirmed that he had the technology to draft the warrant in his patrol vehicle but no means to print the application from there.

### *Trial – July 22, 2021*

After the jury was selected but before they were sworn, the State indicated that it would be going forward on Count 2 under the charge of driving with a BAC of .08. Accordingly, the trial court deleted language regarding the alternate charge of driving with a BAC of .20 from the jury charge.

Officer Millsaps's trial testimony was similar to his testimony from the suppression hearing as set forth above. He reiterated that Defendant's speech was slurred, he had difficulty focusing, and he smelled of alcohol and that he had trouble when asked to show his license, registration, and insurance. Officer Millsaps confirmed that the entire traffic stop was recorded on his bodycam and the dashboard camera ("dashcam") of his patrol vehicle. He wore the bodycam on his belt. Both cameras were equipped to pick up sound, but the bodycam footage provided better quality. The footage from both cameras was played intermittently while the State questioned Officer Millsaps about the stop and the subsequent arrest.

Officer Millsaps testified that he activated his bodycam as he approached the driver side of the vehicle. Officer Millsaps informed Defendant that he had been observed driving recklessly and running a red light. Defendant denied the allegations. Defendant stated that he needed to be at work at 5:00 a.m. When asked why he was driving in reverse, Defendant replied that he was not going in reverse but was trying to turn right "up ahead" to go to Carlex where he worked. When Officer Millsaps asked Defendant for his license, registration, and proof of insurance, Defendant pulled out a stack of papers and admitted that he did not have a valid license "at the moment," and that he had not accrued enough time to take off from work to get his license reinstated. Officer Millsaps then instructed Defendant to turn off his engine and step out of the vehicle.

From the bodycam video, Defendant did not appear to have difficulty exiting his vehicle but once he got out, he stumbled to his right and toward Officer Millsaps. Defendant laid out his paperwork on the trunk of his car. At that point, Officer Millsaps told Defendant, "Every now and then I get a whiff (of alcohol)." Defendant denied having consumed alcohol since 9:00 p.m. the night before. Defendant conceded that it had been three years since his license had been revoked and that he could not legally drive.

Defendant offered to take field sobriety tests, but then refused to take the tests, insisting that he was not drunk and that "all [he] want[ed] to do" was go to work. Eventually, Defendant agreed to take the tests. Officer Millsaps asked Defendant whether "there is anything wrong with his legs." Defendant replied that his legs hurt "from working." Despite Officer Millsaps's directive that Defendant should not begin the walk and turn test until instructed, Defendant said he was familiar with the test and started it anyway. At 4:45 a.m., Officer Millsaps placed Defendant under arrest on suspicion of DUI.

The dashcam also recorded the traffic stop and ensuing arrest and the dashcam video was entered as an exhibit and played at trial. It showed a full view of Defendant exiting his vehicle, stumbling and nearly falling into Officer Millsaps.

Officer Millsaps testified that he arrested Defendant due to his inebriated state and as a matter of public safety:

> Basically[,] I'd seen enough signs to develop probable cause for [impairment]. He was not compliant. It was clear he was not going to let me explain the test. And due to the fact – the main thing is we're on the side of a busy two-lane highway. His vehicle's still halfway in the road. At times we are in the traffic way. It's just a matter of his safety, my safety, and the motoring public's safety. You know, this comes to a point to where it's – it's just time to make the arrest and get everybody off the highway as soon as we can.

Officer Millsaps testified that Defendant's blood was drawn because the jail's intoximeter, also known as a breathalyzer, was broken. Because Defendant expressed several times that he would not submit to a blood draw, Officer Millsaps prepared a search warrant to draw Defendant's blood while the jailers took Defendant for booking. He described the process for preparing a search warrant. In order to execute the warrant, Officer Millsaps had to contact and obtain the signature of a general sessions judge. At that time, Officer Millsaps did not have the capability of communicating with judges via videoconferencing. He called the one general sessions judge available in Monroe County four or five times but his calls went unanswered. He agreed that he probably called the general sessions judge around

6:30 a.m. The general sessions judge returned Officer Millsaps call around 8:00 or 8:30 a.m., but it was "after the fact." Officer Millsaps testified that he had the option to contact a criminal court judge, but that the next closest judge lived in McMinn County and that most of the judges resided in Bradley County. Officer Millsaps was aware that alcohol in a person's body dissipates with the passing of time. When he could not reach the general sessions judge, he contacted the on-call district attorney and advised her of the situation. She suggested that Officer Millsaps proceed to get a blood draw from Defendant based on exigent circumstances.

Officer Millsaps was present when Defendant's blood was drawn. Officer Millsaps's bodycam shows Defendant's blood being drawn at 7:17 a.m., nearly three hours after the stop. Officer Millsaps took possession of the blood sample and submitted it to the Tennessee Bureau of Investigation ("TBI") for analysis.

Officer Millsaps testified that he had been trained on standard field sobriety and that drawing Defendant's blood was "time sensitive" because the body metabolizes alcohol. Defendant was pulled over at roughly 4:30 a.m., and his blood was drawn around 7:30 a.m. Officer Millsaps would have expected Defendant's BAC to be higher at 4:30 a.m. than when it was drawn at 7:30 a.m. Officer Millsaps understood that alcohol affects people differently and that there is not a "set standard" for when the level of alcohol becomes toxic in one's body.

Officer Millsaps recalled Defendant's statement that he had "problems with sugar" and that his legs were "not good and working." He denied that Defendant was ever unconscious. He confirmed that Defendant was parked on the edge of the asphalt where he had to "step off of it." According to Officer Millsaps, Defendant could not "comprehend or follow [his] instructions" to complete the field sobriety tests. Because Officer Millsaps was not trained in drawing blood, an EMT drew Defendant's blood. Officer Millsaps knew that the general sessions judge lived about fifteen minutes away from the jail in Madisonville. He did not drive to the general sessions judge's residence or ask any fellow officers to do so.

Bailee Short, a special agent in the Knoxville Crime Lab of the TBI, testified as an expert in toxicology. Agent Short testified that part of her expertise includes training in how alcohol affects the body physically and psychologically. She explained that alcohol affects people differently based on their level of "tolerance":

> So[,] every single person handles alcohol differently. But as a general trend those who have been drinking a lot longer as opposed to someone who's a naive drink[er] or only recently started drinking are going to build what we call tolerance. And essentially what tolerance is is that it's going to take a

- 6 -

heavily tolerant person a larger amount of alcohol to get to the same effect that a naive user would or somebody who's only been drinking for a year or two. Tolerance basically means that a person can kind of adjust to how alcohol affects them. So[,] whereas somebody who is completely new to drinking may stumble and trip and fall a lot at a certain level of alcohol, a tolerant individual at that same level would see[m] more steady because they know how to adjust their body to that reaction.

The official alcohol report issued by Agent Short was introduced as an exhibit. She tested Defendant's blood sample twice to ensure accuracy. Defendant's ethanol alcohol level was 0.27, or three times the legal limit of 0.08. Agent Short testified that "it would probably take . . . 10 to 20 drinks to get to .27 depending on how fast a person absorbs (alcohol)." She confirmed that it is "definitely doable" for a person to imbibe enough alcohol to measure 0.27 BAC over a four-hour time frame. She explained that based on the timeframe of the stop and the blood draw, any alcohol in Defendant's system was already dissipating. Agent Short confirmed that there was "no[] way" that the BAC was below .08 three hours before the blood draw. While acknowledging again that "every person is different" in absorbing alcohol, Agent Short estimated that the BAC was probably somewhere between .3 and .35 three hours before the blood draw. She confirmed that .3 is "a very high level" of alcohol.

Agent Short described some signs a person, even a "career drinker," might exhibit with a BAC of .3:

[A]t a .3 or above you would definitely expect to see slurred speech. You would have coordination issues, stumbling, dizziness, drowsiness. You'd probably have problems with your memory and your judgment. You'd definitely expect your reaction time to increase. So[,] it's going to take you a lot longer to react to certain things. Like if a deer darted out in front of you in the road, it would take you longer to react to that than if you were sober.

She stated that a career drinker would be awake and functioning at a certain level, but a person who has never had a drink but exhibited a .3 would exhibit more dramatic signs.

Agent Short testified that the TBI received an order to send Defendant's blood sample to a lab in Alabama in December 2019 for additional testing. On cross-examination, she testified that she did not get the result of that test nor did she expect to receive the result. When asked whether a BAC of .247 would be sufficiently different to capture her attention, Agent Short replied that it would not, "given that . . . we finished testing it at the end of March and it wasn't sent out (to Alabama) till December." She added that "in any given time no matter how long it's been[,] levels will slowly start to

drop for both drugs and alcohol." She maintained that a BAC of .27 collected at 7:28 a.m. would have a higher alcohol reading three hours before although she "[c]ouldn't say how much" higher. She clarified her direct testimony that a reading of .3 or .35 would be an approximate reading based on the timeframe of the case. She also clarified that a "career drinker" or a person with higher tolerance could still be conscious despite having a high reading of .3 or .35. Agent Short conditionally agreed that on average, a person with a BAC of .3 or .35 would "very likely . . . be unconscious," but this would depend on the tolerance level of the individual and how that person's body metabolized alcohol.

Defendant, age sixty, testified that he did not lose his job at Carlex Glass for missing work the day of his arrest. When asked what he meant when he told Officer Millsaps that he had "problems with sugar," Defendant explained that he was not diabetic but his sugar "gets low" and when his sugar gets low, his legs hurt. He does not test his sugar but he knows when it gets low because he "feel[s] bad."

Defendant testified that when he saw Officer Millsaps coming in his direction at a high rate of speed with his lights on, Defendant believed the deputy was after someone in front of him so he pulled off to the side of the road. He denied that he was driving in reverse. He maintained that he was in the process of shifting his gear to park when Officer Millsaps pulled in behind him. He testified that he was familiar with the area because he had driven the same 24.7-mile route from his residence in Tellico Plains to Vonore, six days a week for ten years.

Defendant demonstrated that there was about a four-inch height difference between the pavement and the gravel causing him to trip as he stepped out of his vehicle. Defendant denied that he was drunk and denied that his behavior during the traffic stop was due to drunkenness. He said that he was angry during the traffic stop because "[he] was supposed to be at work at [five] o'clock and [he] wasn't going to make it." He was also angry that he was asked to perform field sobriety tests because he "was within sight of the [Carlex] building." He apologized for the language he used that morning but reiterated that he was "just angry," not drunk. He felt he was "falsely accused" and was "shocked" to learn that his BAC came back at .27 because he "wasn't drunk." He instructed his counsel to have the blood sample tested again because the result was "unbelievable." He acknowledged that he had a glass of bourbon the evening before around 8:00 or 9:00 as part of his night time routine.

On cross-examination, Defendant testified that he works at Carlex as a tool and die maker. He confirmed that his job is physically demanding and requires him to be on his feet all day. In terms of his blood sugar, Defendant conceded that he did not have medical proof that he suffered from low blood sugar.

The footage of the dashcam was played again during Defendant's cross-examination. He confirmed that he watched the footage and denied that he put his vehicle in reverse when he pulled over to the side of the road. He maintained that he was shifting his vehicle to park. He disagreed that his speech was slurred. He explained that he was frustrated because he could not locate the proper form to show Officer Millsaps. Defendant testified that he tripped exiting his vehicle because the ground underneath him was uneven. He did not follow Officer Millsaps's instructions on the field sobriety tests because he was "very mad." Defendant explained that he was "ready to go to work" and wanted to start the test so he could show Officer Millsaps that he was not drunk. He stated that "a nervous condition" compelled him to keep his hands in his pockets despite being told repeatedly by Officer Millsaps not to do so. He also stated that it was his normal stance to sway back and forth.

Based on the evidence, the jury convicted Defendant of DUI as charged in Count 1 and DUI per se (BAC .08%) as charged in Count 2. The trial court then proceeded with the bifurcated part of the trial to address the DUI enhancement. After the State read the indictment for Count 3, DUI third offense, it produced two prior DUI convictions in Monroe County with offense dates of August 30, 2015 and April 20, 2016. The disposition of both offenses occurred on July 29, 2016, and resulted in convictions. Defendant stipulated that because of the undisputed prior convictions, he would be found guilty of DUI third offense as charged in Count 3 of the indictment.

The record reflects that a sentencing hearing was delayed by nine months because Defendant was hospitalized. Before sentencing, Defendant filed a motion on February 24, 2022, requesting a new trial. Although a transcript of the sentencing is not in the record, the available record shows that sentencing was held on April 25, 2022, and the judgments reflect a total effective punishment of eleven months, twenty-nine days, suspended to supervised probation upon service of seven months in confinement. Count 3 was merged with Count 1 to reflect a singular conviction of DUI third offense.

A hearing on Defendant's motion for new trial took place on October 14, 2022. Defendant moved for a new trial arguing that the motion to suppress the BAC result should have been granted and that the evidence did not support the verdict. The trial court denied the motion and made the following findings regarding the efforts of Officer Millsaps in trying to reach the general sessions judge to obtain a warrant for the blood draw:

> It took about one hour to one and one quarter hours to transport the defendant to the jail. He called – the officer called the General Sessions judge in Monroe County four to five times and he did not receive an answer. He waited each time for the judge to answer. So[,] to suggest that although the judge lives in close proximity to the justice center for the officer to then drive

to the judge's house to try to get a warrant makes no logical sense. The judge did not answer the phone. So[,] he was either away from his house or sleeping so soundly that a trip to the home likely would have been fruitless.

The trial court distinguished the facts of the case from the facts in *State v. Oaks,* No. E2017-02239-CCA-R3-CD, 2019 WL 560271 (Tenn. Crim. App. Feb. 12, 2019):

> The State cites to the *State* [*v.*] *Oaks* decision a 2019 case where the Court discusses the requirements to have an emergency that justified acting without a warrant and mandates that the Court consider the totality of the circumstances which is a distinguishing factor from the *McNeely* decision which has been the law for a period of years now. In the *Oaks* case the Washington County General Sessions judge lived within a four-mile drive from the hospital. It describes without an effort to seek a warrant the Court could not conclude that to obtain a warrant would have been impractical.

The trial court took judicial notice of the area and the time it would take to attempt to reach the nearest available judges:

> In this case, the officer tried over a period of time with four to five telephone calls to reach the [general sessions] judge. Although there was proof in the record that the Criminal judges or any of Circuit judges or the Chancellor were not even tried [to be contacted], it is true, and I can take judicial notice, that [the] Chancellor [] lives in McMinn County which is adjacent to Monroe County, but all of the other judges are in Bradley County which would have been in an excess of a one-hour drive had contact been attempted. And we all learned from the *McNeely* decision that time remains a factor in that any alcohol in the system would continue to dissipate during the time to get – get a warrant.
>
> So[,] this effort – this officer made efforts. They were significant efforts distinguishing this case from the *Oaks* case. The timeline was vetted in the motion to suppress and in the trial. And for those reasons, I deny the motion for new trial.

Defendant filed a timely notice of appeal.

## Analysis

Although the timeliness of the motion for new trial was not addressed in the briefs, during oral argument, counsel for Defendant explained that the unusual delay between the

filing of the motion for new trial and sentencing, and subsequently, the hearing on the motion for new trial, was due to Defendant's serious medical issues. The trial was held on July 22, 2021; the sentencing hearing was held April 25, 2022; and the hearing on the motion for new trial was held October 6, 2022. Of particular concern to this court was the date of the entry of the judgments of conviction and whether the motion for new trial was filed within thirty days of the entry of the judgments. *See* Tenn. R. Crim. P. 33(b) ("A motion for a new trial shall be in writing or, if made orally in open court, be reduced to writing, within thirty days of the date the order of sentence is entered."); *State v. Johnson,* 980 S.W.2d 414, 418 (Tenn. Crim. App. 1998) ("The thirty (30) day provision is jurisdictional, and an untimely motion for new trial is a nullity."); *State v. Patterson,* 966 S.W.2d 435, 440 (Tenn. Crim. App. 1997) (an untimely motion for new trial waives any issues raised in the motion except sufficiency and sentencing).

On February 24, 2022, after the trial, but before sentencing, Defendant filed a motion to remain on his original bond pending appeal and asking for a new trial, "the grounds for which will be reduced in writing within thirty days." The record includes an agreed order filed on April 13, 2022, to hold the sentencing hearing on April 25, 2022. The record does not include a transcript of the sentencing hearing, but the transcript of the motion for new trial hearing includes Defendant's undisputed procedural summary of the case which identifies April 25, 2022, as the date of sentencing. Additionally, two of the three judgments also reflect a nunc pro tunc date of entry of April 25, 2022.

The judgments reflect a file-stamp date of January 12, 2023. However, the judgments were entered nunc pro tunc as follows: Counts 1 and 3 were entered nunc pro tunc to the date of the sentencing, April 25, 2022; Count 2 was entered nunc pro tunc to the date of the trial, July 22, 2021. *See Thomas v. State*, 337 S.W.2d 1, 4 (1960) ("where a judgment is pronounced but not entered, it may be later entered nunc pro tunc, as of the date of its pronouncement, provided the requisite facts appear of record to justify its entry").

In its brief on appeal, the State noted errors in the judgments which needed to be corrected. At oral argument, defense counsel agreed that there were errors in the judgments, and a remand would be necessary to correct the judgments. Indeed, the judgment for Count 1 indicates that Defendant was convicted of DUI third offense whereas the trial transcript demonstrates he was convicted of DUI; the judgment for Count 2 indicates that it was dismissed whereas the trial transcript shows the jury convicted Defendant of DUI per se; the judgment for Count 3 indicates that Defendant was convicted by a jury whereas the trial transcript shows that he stipulated to his prior convictions that supported the enhancement to DUI third offense given his convictions on Counts 1 and 2. At the bifurcated hearing, the trial court explained that Defendant pled guilty to Count 3.

- 11 -

"[W]here there is a single trial for [the convicted offenses], and where the sentences are entered on different days, we interpret Rule 33(b) as to require a motion for new trial to be filed within thirty days of the day the *last* sentence is entered." *State v. Hatcher,* 310 S.W.3d 788, 801 (Tenn. 2010) (quoting *State v. Bough,* 152 S.W.3d 453, 460-61 (Tenn. 2004)) (emphasis added). In *State v. Siliski,* 238 S.W.3d 338, 374 (Tenn. Crim. App. 2007), this court considered the issues raised in a prematurely filed motion for new trial where (1) the State had not raised the issue on appeal, and (2) no prejudice accrued to the State from the court's consideration of the issues raised in the premature motion.

Based on the record and relevant authority, we rely on April 25, 2022, as the date the sentence was entered. As such, Defendant's motion for new trial was prematurely filed on February 24, 2022. Because the State does not contest the timing of the motion for new trial, and we discern no prejudice caused to the State, we treat Defendant's motion for new trial as timely filed. *Hatcher,* 310 S.W.3d at 799-800 (Supreme Court treated a prematurely filed motion for new trial as timely filed). The appeal is properly before the court.

## I.      Denial of Motion to Suppress

Defendant contends that the trial court abused its discretion in denying his motion to suppress because circumstances did not compel an exigency to draw his blood without a warrant. The State contends the trial court properly denied the motion to suppress because exigent circumstances justified a warrantless blood draw.

We review a trial court's ruling on a motion to suppress by affording the prevailing party the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Carter,* 16 S.W.3d 762, 765 (Tenn. 2000); *State v. Martin*, 505 S.W.3d 492, 500 (Tenn. 2016); *State v. Henry,* 539 S.W.3d 223, 232 (Tenn. Crim. App. 2017). The trial court's findings of fact in a suppression hearing are upheld unless the evidence preponderates against them. *Martin,* 505 S.W.3d at 500; *Keith*, 978 S.W.2d at 864; *Henry,* 539 S.W.3d at 232. The application of the law to the facts found by the trial court is a question of law and is reviewed on appeal de novo. *State v. Clayton*, 535 S.W.3d 829, 846 (Tenn. 2017); *State v. Willis*, 496 S.W.3d 653, 686 (Tenn. 2016); *State v. Climer,* 400 S.W.3d 537, 556 (Tenn. 2013). "Further, appellate courts, when evaluating the correctness of the ruling by the trial court on a motion to suppress, may consider the entire record, including not only the proof offered at the hearing, but also the evidence adduced at trial." *State v. Williamson*, 368 S.W.3d 468, 473 (Tenn. 2012).

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect citizens from unreasonable searches and seizures. U.S. Const. amend. IV; Tenn. Const. art. 1, § 7. *See also State v. Reynolds*, 504 S.W.3d

283, 312-13 (Tenn. 2016); *State v. McCormick*, 494 S.W.3d 673, 683-84 (Tenn. 2016). The "taking of a blood sample . . . is a search" and therefore invokes constitutional protections. *Reynolds,* 504 S.W. 3d at 304 (quoting *Birchfield v. North Dakota*, 579 U.S. 438, 455 (2016)). "[A] warrantless search of the person is reasonable only if it falls within a recognized exception." *Missouri v. McNeely,* 569 U.S. 141, 148 (2013). One well-recognized exception is the exigent circumstances exception. *Birchfield,* 579 U.S. at 456; *Schmerber v. California,* 384 U.S. 757, 770-72 (1966). This exception applies when "the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment." *McNeely,* 569 U.S. at 148-49 (quoting *Kentucky v. King,* 563 U.S. 452, 460 (2011)).

Exigency is determined based on the totality of the circumstances "known to the governmental actor at the time of the entry." *State v. Meeks,* 262 S.W.3d 710, 723 (Tenn. 2008); *see also McNeely,* 569 U.S. at 149-50 (citations omitted). The following is a non-exhaustive list of "frequently-arising situations" found to be sufficiently exigent to render a warrantless search reasonable: (1) when officers are in "hot pursuit" of a fleeing suspect; (2) when officers thwart the escape of known criminals; (3) when a suspect presents an immediate threat to the arresting officers or the public; or (4) when immediate police action is necessary to prevent the imminent destruction of vital evidence. *Meeks,* 262 S.W.3d at 723; *see also State v. Adams*, 238 S.W.3d 313, 321 (Tenn. Crim. App. 2005).

As relevant to this case, the United States Supreme Court held that the natural metabolization of alcohol in the bloodstream is not a per se exigency that justifies an exception to the warrant requirement for nonconsensual blood testing in all drunk-driving cases. *McNeely,* 569 U.S. at 152-56. Rather, consistent with the totality of the circumstances test, the Supreme Court clarified that "the metabolization of alcohol in the bloodstream and the ensuing loss of evidence are among the factors that must be considered in deciding whether a warrant is required." *Id.* at 165. Indeed, the Supreme Court acknowledged the importance of obtaining a blood draw in determining the BAC at the time of the offense:

> While experts can work backwards from the BAC at the time the sample was taken to determine the BAC at the time of the alleged offense, longer intervals may raise questions about the accuracy of the calculation. For that reason, exigent circumstances justifying a warrantless blood sample may arise in the regular course of law enforcement due to delays from the warrant application process.

*Id.* at 156.

- 13 -

Since *McNeely*, this court has addressed the issue of whether a warrantless blood draw was justified based on exigent circumstances in several DUI cases in addition to *State v. Oaks. See, e.g., State v. Kennedy*, No. M2013-02207-CCA-R9-CD, 2014 WL 4953586, at *8-10 (Tenn. Crim. App. Oct. 3, 2014) (no exigent circumstances to justify warrantless blood draw where nothing prevented one of the three officers from obtaining a warrant while the other officers transported defendant to the hospital for the blood draw performed seventy-three minutes after defendant refused consent); *State v. Wells*, No. M2013-01145-CCA-R9-CD, 2014 WL 4977356, at *5 (Tenn. Crim. App. Oct. 6, 2014) (no exigent circumstances where none of the five officers investigating the case obtained a warrant where a magistrate was on duty in a building ten minutes from where defendant was apprehended, and it took the magistrate an average of ten minutes to review a warrant); *State v. Turner,* No. E2013-02304-CCA-R3–CD, 2014 WL 7427120, at *7 (Tenn. Crim. App. Dec. 30, 2014) (no exigent circumstances where the supervisor, the arresting state trooper, and five responding police officers could have helped obtain a warrant prior to the blood draw an hour after the traffic stop); *State v. Gardner,* No. E2014-00310-R3-CD, 2014 WL 5840551, at *9 (Tenn. Crim. App. Nov. 12, 2014) (no exigent circumstances where none of the three responding deputies sought a warrant prior to the blood draw performed forty-four minutes after the traffic stop); *cf. State v. Walker*, No. E2013-01914-CCA-R3-CD, 2014 WL 3888250, at *2-5 (Tenn. Crim. App. Aug. 8, 2014) (warrantless blood draw justified based on exigent circumstances where lone responding officer was responsible for clearing the motorcycle accident scene and conducting the investigation); *State v. Martin*, No. M2016-00615-CCA-R3-CD, 2017 WL 1957810, at *7 (Tenn. Crim. App. May 11, 2017) (warrantless blood draw justified based on exigent circumstances where lone responding officer was responsible for clearing the single car accident scene and conducting the investigation and where probable cause for DUI was developed two hours after vehicle accident).

Even before the COVID-19 global pandemic, the United States Supreme Court recognized that advances in technology would not guarantee that delays in the warrant application would be eliminated:

> Telephonic and electronic warrants may still require officers to follow time-consuming formalities designed to create an adequate record, such as preparing a duplicate warrant before calling the magistrate judge. And improvements in communications technology do not guarantee that a magistrate judge will be available when an officer needs a warrant after making a late-night arrest. But technological developments that enable police officers to secure warrants more quickly, and do so without undermining the neutral magistrate judge's essential role as a check on police discretion, are relevant to an assessment of exigency.

- 14 -

*McNeely*, 569 U.S. at 155.

In this case, in denying the motion to suppress Defendant's BAC result, the trial court made detailed findings of fact relating to the time from the Officer Millsaps's traffic stop of Defendant to the blood draw. The trial court first noted the technology available to Officer Millsaps at the time of the arrest to prepare a warrant:

> Well, what I think is real important in this case or an observation I want to make is that this is pre-coronavirus pandemic. In March of 2019 here in this district we did not have []all of those special remedies to give judges computers that they could take home. In 2019[,] I had never heard of the videoconferencing platform Zoom and certainly Courts were not able to do the things that technology forced by the coronavirus cause us to do now.

The trial court credited Officer Millsaps's testimony that he was delayed in obtaining the warrant because he was solely responsible for Defendant's vehicle as the arresting officer:

> So what you have is an officer that responds to a – what he describes as a reckless driver at 4:26 a.m. He made contact with the vehicle, did his investigation. [D]efendant smelled of alcohol, failed the field sobriety test, and he made the decision at 4:47 to place this [D]efendant under arrest for drunk driving. Before he could not leave the scene he had to call for a tow truck, inventory the vehicle, do this tow s[w]eep. And it is unclear to me from the proof that was developed when the Vonore officer came onto the scene, but at some time during this process when he is conducting this and apparently it's after the inventory is done and after the tow truck was called that the Vonore officer agreed to monitor traffic and to stay there and wait until the tow truck arrived.
>
> I credit this officer's testimony that once he makes a stop and takes someone into custody, he is responsible for [D]efendant's motor vehicle and the safe – and preservation of it. And so he clearly had a continuing duty up until that second officer came which was at 5:14 a.m. So at 5:14 a.m. is when he made the decision to leave the scene in the control of the Vonore officer and to transport [D]efendant to the jail.
>
> So if the incident occurred at 4:26, by – roughly 4:30, by 5:15 about 45 minutes had passed. He then drove [D]efendant to the jail. And although the officer testified that he was able to type within his car, he was unable to print within the car. So he might have been able to start his paperwork if he

- 15 -

had not been monitoring traffic and trying to do all these other preservation actions that were required.

At 5:35 – so now a little over an hour he booked [D]efendant into the jail and he testified that it was at that time he learned the intoximeter was out of service. He took the steps to guard [D]efendant's rights by drafting a search warrant and seeking the – a judge to sign it. He indicated that that took 30 to 40 minutes which would have been about 6 or 6:15 a.m. At that point, he testified that he called [general sessions judge] five times. Well, when an officer has the judge's telephone number and he calls five times, the only conclusion the officer can draw is either the judge is out of town, doesn't have his phone turned on, the phone has run out of charge, or he is otherwise unable to make contact with the judge.

At that point in time, he called the District Attorney's Office for advice. And the District Attorney's Office agreed with his conclusion that to drive to Cleveland would be an hour for the drive down there, however long it took in the judge's home to review the steps and sign the warrant and then an hour drive back which would have been somewhere between two to two and a half hours [t]o contact a different judge.

Now, there would have been a chancellor in McMinn County who could have signed the warrant which would have cut about 30 minutes in each direction off the trip, but still that would have perhaps narrowed it to an hour and a half instead of two and a half hours and that's on top of already a two and a quarter hour delay.

So even though he sought not to contact the chancellor or the one of three judges that could have signed the warrant that reside in Bradley County, that is a good deal of time missing.

So in 2019 – and I do note that blood does dissipate over – not blood, but blood alcohol, the alcohol in the blood metabolized and dissipates over time. And that's why time is of the essence in collecting this evidence.

Based on the advice of the District Attorney's Office[,] [Officer Millsaps] aborted the possibility of making this other call and actually did a warrantless draw relying on exigent circumstances. Although . . . the officer does not remember whether [D]efendant did or did not consent or whether he asked, he clearly remembered [D]efendant indicating he had refused a blood test and was not going to give blood.

- 16 -

The trial court found the circumstances in this case to be distinct from *Oaks* because in *Oaks*, probable cause was developed shortly after an officer arrived at the crash site and at least one of the multiple officers who ultimately arrived at the scene could have secured a warrant while the others were investigating the case and guarding the scene. The trial court found that although probable cause of impairment was developed within minutes of Officer Millsaps's arrival at the scene in this case, he was the lone investigating officer and was tasked with transporting Defendant to the jail, securing Defendant's vehicle, and seeking the warrant. Moreover, the trial court found that Officer Millsaps lacked the technology to expedite the process to obtain the warrant. The trial court instead found that once Defendant refused consent to the blood draw, Officer Millsaps wrote the warrant, called the general sessions judge, and contacted the on-call district attorney when the judge could not be reached.

The trial court determined that the warrantless blood draw was justified based on the totality of the circumstances:

> I agree with defense counsel a citizen's rights should be protected. And to actually draw blood is one of the – what's in your system, you have no greater expectation of privacy than what is in your system. But under these circumstances, I ask myself what else could law enforcement have done. And the only answer is spend one and half to two and a half more hours to try to make contact with a judge when the alcohol is continuing to dissipate.
>
> So [Officer Millsaps] did everything within his capability to guard the rights of [D]efendant. It's just all of the factors that were available, the Judge Thomas not being home, not having computers, such a long distance to travel, the fact that he could type but not print within in his car, that there was no videoconferencing. All of this creates exigent circumstances that justify the blood draw.

The evidence does not preponderate against the trial court's factual findings. Defendant's reliance on *McNeely* or *Oaks* is misplaced. Notably, in both *McNeely* and *Oaks,* the arresting officer or investigating officers made no effort to secure a warrant, contact the on-call prosecuting attorney, or call a magistrate. 569 U.S. at 163; 2019 WL 560271, at *18. In this case, Officer Millsaps did all three, and he did it alone.

In *McNeely,* the defendant was pulled over for speeding and crossing into the other lane of traffic. 569 U.S. at 145. Probable cause for DUI was developed during the traffic stop, and the defendant was placed under arrest. *Id.* The sole arresting officer was on his way to transport the defendant to the jail until the defendant refused consent to a blood

draw. *Id.* at 145-46. The officer did not attempt to secure a warrant but changed course and drove instead to a hospital where the defendant's blood was drawn. *Id.* at 145-46. Although the United States Supreme Court did not engage in a detailed discussion of "all the relevant factors that can be taken into account in determining the reasonableness of acting without a warrant,"[2] *id.* at 165, the Court nevertheless made several observations about the arresting officer's testimony. For instance, the officer did not make any effort to secure a warrant before the blood draw even though he was "sure" a prosecuting attorney was on call, and he had no reason to believe that a magistrate was unavailable. *Id.* at 163. The officer did not identify any emergency or unusual delay he faced securing a warrant. *Id.* He admitted that he had previously obtained search warrants for a blood draw without difficulty, but chose not to obtain one in the case because he believed it was not legally necessary. *Id.*

In *Oaks,* three officers of the state highway patrol were present at the crash site of a head-on collision purely to conduct a criminal investigation. 2019 WL 560271, at *18. Despite the "chaotic" circumstances of the accident, probable cause of the defendant's intoxication was developed a few minutes after the first officer's arrival on the scene. *Id.* The defendant, who was gravely injured, was transported to the hospital soon after the second officer arrived at the crash site. *Id.* The defendant entered the operating room an hour and a half after the first officer arrived at the crash site and fifty-two minutes after a third officer arrived at the hospital. *Id.*

Although the accident occurred in Carter County, the defendant was being treated in a hospital in Washington County, a county in the same judicial district. *Id.* at *3, 18 n.3. Accordingly, a magistrate judge in Washington County also had jurisdiction to issue a warrant. *Id.* at *18 n.3. Testimony established that a Washington County General Sessions Judge lived within a four-minute drive from the hospital. *Id.* at *18. In addition to close proximity to a general sessions judge, the officers had the capability to type and print warrants from their cruisers. *Id.* at *3. The first officer at the scene estimated that it would have taken "over an hour" to complete the warrant application, find and submit the application to a Carter County judge, and return to the hospital in Washington County. *Id.* at *3. A fellow officer testified to the same time period for obtaining a warrant in Carter County. *Id.* at *4. The third officer recalled that it took him "[a]t best, two hours" to obtain a prior warrant in Carter County. *Id.* at *5. No effort was made to obtain a warrant or contact a magistrate. *Id.* The officers believed that a warrant was not necessary under the circumstances. *Id.* at *19. None of the officers called a judge, and only one tried to call a district attorney who did not answer the call. *Id.* at *3-5.

---

[2] The State of Missouri argued its case on the broad proposition that the natural metabolization of alcohol in the body created an exigent circumstance in every case, and not whether it had satisfied its burden of establishing exigent circumstances in the specific case before the court. *Id.* at 165. Thus, the record lacked "an adequate analytic framework" for the Supreme Court to make a detailed discussion. *Id.*

- 18 -

Given the totality of the circumstances and the numerous distinctions between this case and *McNeely* and *Oaks,* we conclude that the blood draw was justified by exigent circumstances. Unlike *McNeely,* once Defendant refused consent to a blood draw, Officer Millsaps began the process to obtain a warrant and did so as efficiently as possible. Officer Millsaps prepared the application and called the general sessions judge "at least five times," but the judge did not answer any of the calls. He then reached out to the on-call district attorney who advised him to proceed with the blood draw without a warrant under the circumstances.

Unlike *Oaks,* Officer Millsaps was the lone investigating officer on the case. Although the Vonore Police officer arrived at the scene sometime after Officer Millsaps, he took no role in investigating the case. The footage of the dashcam corroborates Officer Millsaps's testimony that the Vonore Police officer took no part in questioning Defendant, in conducting the field sobriety test, or searching Defendant. The Vonore Police officer did not engage with Defendant and served only to assist Officer Millsaps in directing traffic and to wait for the tow truck. The only time he had any contact with Defendant was when Defendant wandered into traffic to look for his car keys and when he held the flashlight so Defendant could better look for his paperwork to reinstate his license. Thus, as the sole officer in charge of the investigation, it was Officer Millsaps's duty to secure Defendant's vehicle and obtain the warrant once Defendant expressed his refusal to a consensual blood draw. *See Martin,* 2017 WL 1957810, at *7 (although there were two sheriff's deputies at the accident scene, they did not assist with the accident or DUI investigation, relay any suspicions of intoxication to the responder trooper, but left fifteen minutes after the trooper arrived).

Unlike *Oaks,* had Defendant refused consent in the car as they were traveling to the jail or at the scene, Officer Millsaps lacked the capability to draft *and* print the warrant from his patrol car to deliver to the general sessions judge to review. Furthermore, unlike *Oaks,* the evidence did not establish that a criminal court judge in Bradley County was more convenient or accessible to Officer Millsaps. Testimony at the suppression hearing supported the trial court's finding that it would take approximately two to two-and-half hours to reach a criminal court judge in the next closest town of Cleveland.

As a twenty-year veteran in law enforcement, Officer Millsaps understood that alcohol dissipates in the body and was therefore concerned for the potential of blood evidence to be "lost" had he waited longer to obtain Defendant's blood. Furthermore, Agent Short testified that any alcohol in Defendant's system was already dissipating in the three-hour gap between the traffic stop of the blood draw.

- 19 -

In examining the totality of the circumstances, we conclude that the circumstances articulated by Officer Millsaps "g[a]ve rise to an objectively reasonable belief that there was a compelling need to act and insufficient time to obtain a warrant." *Reynolds,* 504 S.W.3d at 304-05. Defendant is not entitled to relief.

## II. Sufficiency of the Evidence

Defendant claims that "[a] rational juror, considering all of the evidence in this case exclusive of the warrantless blood alcohol analysis, could not have concluded, beyond a reasonable doubt, that [he] was guilty of [DUI]." He argues that without the results of the BAC, the jury "could have credited his testimony" about the circumstances of the traffic stop. He argues further that the dashcam and bodycam recordings are "not dispositive" of his guilt. The State contends any sufficiency analysis must include the results of the BAC, which supports the DUI conviction. The State also contends the evidence is sufficient to support the DUI conviction without the BAC results. We agree with the State.

When a defendant challenges the sufficiency of the evidence, this court is obliged to review that claim according to certain well-settled principles. A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Allison,* 618 S.W.3d 24, 33 (Tenn. 2021); *State v. Gentry,* 538 S.W.3d 413, 420 (Tenn. 2017). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Jones,* 589 S.W.3d 747, 760 (Tenn. 2019).

The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Shackleford*, 673 S.W.3d 243, 250 (Tenn. July 14, 2023). On appeal, "all reasonable and legitimate inferences from the evidence must be drawn in favor of the prosecution and all countervailing evidence discarded." *State v. Weems*, 619 S.W.3d 208, 221 (Tenn. 2021). As such, this court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *Id.* (citing *State v. Stephens*, 521 S.W.3d 718, 724 (Tenn. 2017)). Questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *Allison,* 618 S.W.3d at 34; *Jones,* 589 S.W.3d at 760. "This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both." *State v. Williams*, 558 S.W.3d 633, 638 (Tenn. 2018) (citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)).

As this court pointed out to defense counsel at oral argument, in order to conduct sufficiency review, we must consider all the evidence, including evidence which may have

been improperly admitted. *State v. Long,* 45 S.W.3d 611, 619 (Tenn. Crim. App. 2000); *see also State v. Land*, No. M2018- 02121-CCA-R3-CD, 2020 WL 821273, at *14 (Tenn. Crim. App. Feb. 19, 2020) ("[T]he sufficiency of the convicting evidence must be examined in light of all the evidence presented to the jury, including that which is improperly admitted. Thus, even if the evidence was admitted in error, it does not affect this court's sufficiency analysis."); *Oaks,* 2019 WL 560271, at *20-22 (considering improperly admitted BAC test results in the sufficiency analysis and concluding that the evidence of intoxication was sufficient).

Here, Defendant stands convicted of DUI; DUI, per se; and DUI, third offense. Because Defendant has limited his argument on appeal to DUI as charged in Count 1, we shall do the same. In Tennessee,

> It is unlawful for any person to drive or to be in physical control of any automobile or other motor driven vehicle on any of the public roads and highways of the state, or on any streets or alleys, or while on the premises of any shopping center, trailer park, or apartment house complex, or any other premises that is generally frequented by the public at large, while:
>
> (1) Under the influence of any intoxicant, marijuana, controlled substance, controlled substance analogue, drug, substance affecting the central nervous system, or combination thereof that impairs the driver's ability to safely operate a motor vehicle by depriving the driver of the clearness of mind and control of oneself that the driver would otherwise possess[.]

T.C.A. § 55-10-401(1).

Viewing the proof in the light most favorable to the State, the evidence demonstrates that Defendant was found in physical control of his vehicle, which was in reverse and partially on a public road, causing vehicles to move into the opposing lane to avoid hitting him. Moments before, he was observed driving "recklessly" and had run a red light. Defendant's blood, drawn three hours after he was found on the side of the road, showed a BAC of 0.27 which was more than three times the legal limit. *See id.* § 55-10-401(2). TBI Special Agent Short testified that Defendant's body was metabolizing the alcohol in his system during the three-hour gap between the traffic stop and the blood draw suggesting that his BAC was probably higher while he was driving. While recognizing that every person's tolerance for absorbing alcohol is different, Agent Short estimated that Defendant's BAC was probably between 0.3 and 0.35 three hours before the blood draw. She explained that 0.3 constitutes "a very high level" of alcohol and generally manifests slurred speech, stumbling, dizziness, drowsiness, and issues with memory and judgment. Defendant exhibited some of the same signs. Officer Millsaps testified that in addition to

smelling of alcohol, Defendant was unsteady on his feet, had difficulty comprehending simple questions, ignored his instructions to watch his demonstration of the second sobriety test before proceeding, and in fact failed to complete both sobriety tests.

Defendant argues that without the BAC test result, the jury would have credited his explanation for his behavior during the traffic stop. On appeal, we do not make credibility determinations or reweigh the evidence. This is a jury function. Here, the jury, unlike this court, observed the testimonies of Defendant and Officer Millsaps, and by their verdict, did not find Defendant's explanations to be credible. Even if the BAC result was disregarded, the testimony of Officer Millsaps was sufficient to support the conviction. *See State v. Vasser*, 870 S.W.2d 543, 544 (Tenn. Crim. App. 1993) (deputy's testimony alone was sufficient to prove its DUI case).

Moreover, we cannot agree with Defendant's assessment that the bodycam and dashcam recordings are not dispositive. The jury viewed both recordings of the traffic stop. This court has also viewed the same recordings. *See State v. Binette*, 33 S.W.3d 215, 219 (Tenn. 2000) (an appellate court is equally as capable as a trial court of reviewing videotape evidence). The recordings corroborated Officer Millsaps's testimony that Defendant was argumentative, unfocused, unsteady on his feet, failed to follow instructions, had trouble with both sobriety tasks, parked his vehicle partially on the road creating a hazardous road situation in a high traffic area and time of day, and nearly wandered into passing traffic when he tried to retrieve his car keys. The proof was legally sufficient for a reasonable jury to convict Defendant of DUI. He is not entitled to relief.

### Conclusion

After a thorough review of the record, we affirm the judgments of the trial court. However, as noted above, there are errors with the judgment forms. While we do not have the transcript of the sentencing hearing, we note that the judgment form for Count 1 reflects a conviction for DUI third offense. The record reflects that the jury convicted Defendant in Count 1 of DUI. Next, the judgment form for Count 2 reflects a dismissal of DUI. The record reflects that the jury returned a guilty verdict in Count 2 of DUI per se, BAC of .08%. Finally, the judgment form for Count 3 reflects a conviction for "sentencing enhancements" by a jury verdict. The record indicates a conviction for DUI third offense based on Defendant's plea to that count. Thus, we remand for correction of the judgments accordingly.

_____
JILL BARTEE AYERS, JUDGE